# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNCOMMON, LLC,

       Plaintiff,

       v.

SPIGEN, INC.,

       Defendant.

Case No. 15-cv-10897

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Uncommon, LLC sued Defendant Spigen, Inc. for using the trademarked term "Capsule" in the names of its cell phone cases, the same product that Plaintiff sells under the Capsule mark. Plaintiff brings claims for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and unfair competition under Illinois common law. [1]. Defendant asserts counterclaims seeking cancellation of Plaintiff's Capsule mark for genericness and descriptiveness. [47]. Before this Court are Plaintiff's motion to strike Defendant's expert report [104]; Defendant's motion to strike Plaintiff's expert report [107]; Plaintiff's motion to strike an affidavit from Defendant's nontestifying expert [177]; Defendant's motion to withdraw answers to Plaintiff's requests for admission [180]; and the parties' cross-motions for summary judgment [123, 147].

As explained below, this Court denies the parties' motions to strike; partially grants and partially denies Defendant's motion to withdraw answers; and partially grants and partially denies the parties' motions for summary judgment.

## I. Background

### A. Disputed Facts

The facts in this section come primarily from Defendant's Local Rule 56.1 statement of facts [124] and Plaintiff's Local Rule 56.1 statement of facts [149].[1] The parties disagree over many of the circumstances of this case and each filed extensive responses to the other's statement of facts, [152, 157], and statement of additional facts, [169, 171]. Simply denying a fact that has evidentiary support "does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment." *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015). Denials "must cite specific evidentiary materials justifying the denial" or be disregarded. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Further, responses to the opposing party's statement of facts are not the place for "purely argumentative details," *id.*, or legal conclusions, *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 1997). District courts may disregard any improper denials. *See id.*; *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004).

Plaintiff argues in its reply brief on its motion for summary judgment that many of Defendant's responses to Plaintiff's statement of facts should be disregarded. [168] at 7. But Plaintiff waived this argument by failing to raise it before the reply brief. *See, e.g.*, *Padula v. Leimbach*, 656 F.3d 595, 605 (7th Cir. 2011). Even so, this Court retains discretion to enforce Local Rule 56.1. *See*

---

[1] In citations, "DSOF" refers to Defendant's statement of undisputed facts [124], with Plaintiff's responses [157] cited as "R. DSOF." "PSOF" refers to Plaintiff's statement of undisputed facts [149], with Defendant's responses [152] cited as "R. PSOF." "PSAF" refers to Plaintiff's statement of additional facts [157], with Defendant's responses [171] cited as "R. PSAF." "DSAF" refers to Defendant's statement of additional facts [152], with Plaintiff's responses [169] cited as "R. DSAF." References to additional filings are by docket number.

*Ammons*, 368 F.3d at 817. To the extent that Defendant's responses fail to cite specific evidence in the record, this Court will disregard them and deem Plaintiff's statement of fact to be admitted. *See Malec*, 191 F.R.D. at 583–84.

The majority of responses that Plaintiff challenges sufficiently conform to Local Rule 56.1 to remain in the record. In most responses Defendant admits the statement in part and disputes the remainder either by citing to the record or re-citing the portion of the record relied upon by Plaintiff. In some responses, Defendant limited its reply because it objected to the form of Plaintiff's statement as containing improper legal argument or as unsupported by the evidence. This Court considers this to be the case with respect to Defendant's responses to paragraphs 1–3, 5, 7–10, 15, 16–18, 20, 21, 26, 29–37, and 39–42, and declines to strike those responses. In a few instances, however, Defendant failed to cite to any record evidence: this is true of its responses to paragraphs 6, 14, 23, 25, 28, and 38 of Plaintiff's statement of facts. This Court disregards those denials and considers Plaintiff's corresponding statements admitted. *Malec*, 191 F.R.D. at 583–84.[2]

## B.     This Case

The parties make and sell cell phone cases. PSOF ¶¶ 5, 6. Plaintiff sells a number of case models that consumers can customize with their own images, as well as "ready-made" varieties available with mass-produced designs or licensed artwork. DSOF ¶ 42; R. DSOF ¶ 40.

---

[2] Plaintiff's reply brief contains additional arguments about other disputed responses by Defendant. *See* [168] at 8–10. But these overlap with Plaintiff's arguments against Defendant's motion to withdraw certain of its admissions, which this Court addresses later in this opinion. This Court will not consider additional, waived arguments on that issue.

In September 2012, Plaintiff applied to register the name "Capsule" as a trademark for one of its lines of cases. PSOF ¶ 4. The Capsule mark issued in May 2013 as Trademark Registration No. 4,338,254, for "cases specifically adapted for protection and storage of consumer electronics, namely, cellular phones and mobile media players." *Id.*; [149-3]. The mark's registration lists its "first use" and "in commerce" dates as December 16, 2009. [149-3]. Its registration date is May 21, 2013. *Id.* Plaintiff sold its first Capsule case in July 2010, and has continuously sold cell phone cases with the mark since that date. DSOF ¶ 32; PSOF ¶ 5.

When Plaintiff registered its mark, it appears that another company, Vatra, Inc., had registered "Capsule" as a trademark for "bags and cases" for "holding or carrying" cell phones, cameras, glasses, and other accessories. [124-8] at 6. Vatra, however, never followed up on its initial registration by providing a certificate of "continued use or excusable non-use," which must be submitted to the U.S. Patent and Trademark Office (USPTO) between the fifth and sixth year after registration to maintain a valid trademark. *See id.* at 5. In any event, the USPTO cancelled Vatra's Capsule mark in February 2015 for lack of that certificate, *id.* at 3, and it did not flag Vatra's mark as a potential source of confusion when Plaintiff applied for its Capsule mark, DSOF ¶ 13; [149-3].

There are, however, additional third-party suppliers that sell cases whose names contain the term "Capsule," including Accez, iPhone TPU, Jammylizard, Catalyst, and others. *See* [124-10]. Plaintiff's own exhibit of online search results for "capsule," submitted with its Complaint, shows that case producers (other than

the parties here) use the term. [1-6]; [124-9] at 8.[3] Such third-party use of Capsule, even in relation to cell phone cases, did not affect Plaintiff's registration of its mark with the USPTO.

Around 2010, Defendant also began selling cell phone cases with the name "Capsule." PSOF ¶ 6. These cases sometimes, but not always, used capsule with other modifiers; for example, Defendant's products include "Air Capsule," "Capsule Solid," and "Capsule Capella." *Id.* ¶¶ 6, 9; DSOF ¶¶ 53, 54. By November 2014, Defendant had submitted registration applications to the USPTO to trademark these "Capsule family" product names. PSOF ¶¶ 6, 12. At least one of these marks—Capsule Capella—was approved and registered with the USPTO in May 2017. [124-4] at 4; CAPSULE CAPELLA, Registration No. 5,297,564.[4] Although the Capsule Capella mark was originally rejected by the USPTO for likelihood of confusion, the objection was withdrawn upon review. [124-4] at 6. The registration for Capsule Capella includes the disclaimer that Defendant makes no claim to the

---

[3] Despite offering its own internet search evidence, *see* [1-6], [149-19], Plaintiff offers a number of perfunctory hearsay objections to Defendant's internet evidence, without citing to law, *see* R. DSOF ¶ 11. This Court finds the internet search evidence admissible under Federal Rule of Evidence 807. The internet evidence offered by both sides consists of images of search returns on the parties' websites or retail websites like Amazon, *see, e.g.*, [149-18], [124-22], and is likely to be trustworthy because it is in the seller's interest to accurately represent its products. Additionally, this evidence is more probative on the issue of consumer confusion—an element of trademark infringement—than any other comparable evidence and admitting it will best serve the purposes of the federal rules and the interests of justice. *See* Fed. R. Evid. 807; *see also Peerless Indus., Inc. v. Crimson AV LLC*, No. 11-c-1768, 2017 WL 1192805, at *3 & *3 n.6 (N.D. Ill. Mar. 31, 2017) (affirming use of Amazon.com print-out as evidence of public availability of a product); *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 967 (Fed. Cir. 2007) (internet search results are evidence of the descriptiveness of a mark); 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 11:20, 20:126.50 (5th ed.) (discussing use of internet search results to show descriptiveness and consumer understanding and use of a term).

[4] This Court may take "judicial notice of public records and government documents, including those available from reliable sources on the Internet." *Sleeter v. Actavis Totowa, LLC*, No. 10-653-GPM, 2010 WL 3781261, at *2 n.1 (S.D. Ill. Sept. 21, 2010) (citing *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002)).

"exclusive right to use 'Capsule' apart from" its appearance in the mark as shown. CAPSULE CAPELLA, Registration No. 5,297,564. Defendant's "Rugged Capsule" mark was also initially rejected, both for likelihood of confusion and because the USPTO determined that the mark was "merely descriptive" of an attribute of the Defendant's case. [124-6] at 16–17. Defendant still sells its "Capsule family" cases, on its website and through online retailers such as Amazon and eBay. PSOF ¶ 11.

Defendant also claims that it sold a "Capsule" cell phone accessory in June 2009, predating Plaintiff's first use of the Capsule mark. *See* R. DSOF ¶ 22; [124-11]. This product was the "SGP Metal Advance Light," which came in a variety of styles, including "Capsule Nickel" and "Capsule Gold." *See* PSOF ¶ 25; [124-11]. The SGP Metal Advance, however, was a cell phone "skin," a decorative sticker for the front of a phone. PSOF ¶¶ 26–28; [150-5]. It was not a cell phone case. In any event, this use of "capsule" merely described one of the designs in which the sticker was available—specifically, the option to have the sticker in a gold or nickel color with a pattern of repeating medicine capsules. *See* [124-11, 149-26]. Thus, "capsule" as Defendant used it in 2009 described a decorative pattern by naming the objects in the pattern, and was not a product identifier. It has little relevance here.[5]

---

[5] Defendant argues that this purported prior use may be grounds for cancellation of Plaintiff's mark. [125] at 13. There are two glaring problems with this argument, as evidenced by the very cases Defendant cites. In *Martahus v. Video Duplication Services*, the Federal Circuit noted that 15 U.S.C. § 1052(d) supports cancellation on the basis of prior use when the subsequently registered mark "so resembles a mark or trade name previously used in the United States by another, and not abandoned, as to be likely, when used in connection" with the second user's product, to "cause confusion." 3 F.3d 417, 421 (Fed. Cir. 1993). Even if Defendant could show that its use of "capsule" as a decorative sticker was likely to cause confusion with Plaintiff's cell phone case—a doubtful proposition—its single citation to an image of this capsule-patterned sticker, *see* DSOF ¶ 15, [124-55], does not satisfy *Martahus*' requirement that cancellation of a registered mark on these grounds rebut the registered mark's presumed validity by a preponderance of the evidence, 3 F.3d at 421.

Thus, the disputed products consist of Plaintiff's Capsule cell phone cases and Defendant's "Capsule family" cases. Both parties sell their Capsule cases online, through their websites and online retailers. PSOF ¶ 14; [1-6]; [124-28]; [124-34]. Both have a national market. PSOF ¶¶ 13, 14. Both parties use the trademarked term alone and in conjunction with the word "case." [149-11]; [149-19]; [124-12]; [124-28]; R. DSOF ¶ 20; DSAF ¶ 4. Defendant, as noted, also uses the term with other descriptors, and has trademarked at least one of the resulting phrases. *See* [124-4]; DSAF ¶ 6. The Capsule marks for which Defendant has sought or is seeking registration have first-use dates no earlier than February 2015. DSAF ¶ 6. Defendant briefly ceased selling its Capsule family cases during the pendency of this litigation but has resumed its sales. PSOF ¶ 38.

Although both parties currently sell Capsule cases, Plaintiff does not sell its Capsule models for iPhones after the 5/5s generation, with the exception of the iPhone SE. PSOF ¶ 5; R. DSOF ¶¶ 43, 44. The trademarked Capsule models are limited to cases for the iPhone 5/5s, iPhone SE, iPhone 4/4s, and the fourth generation iPod Touch. R. DSOF ¶ 43. Plaintiff's cases for these goods can be customized by consumers or bought with ready-made prints. *Id.* Plaintiff did not produce Capsule cases for later generations because it was more difficult to print customized designs—generally supplied by consumers—on the cases that fit those generations. R. DSOF ¶ 44. Defendant's challenged cases, by contrast, are not customizable, and appear to be sold primarily in solid colors. DSOF ¶ 50; *see also* [149-19] (Capsule products on Defendant's website). Also, Defendant sells Capsule family cases for phones other than the iPhone, such as the Samsung Galaxy, *see*

[149-19], while Plaintiff's Capsule models only fit iPhones, *see* PSOF ¶ 5; R. DSOF ¶¶ 43, 44; [124-2, 124-12, 124-23]. Plaintiff admits that it has no evidence of actual confusion between its Capsule cases and Defendant's cases. R. DSOF ¶ 52.

In December 2015, Plaintiff sued Defendant for federal trademark infringement under 15 U.S.C. § 1114(a); unfair competition and false designation of origin under 15 U.S.C. § 1125(a); and Illinois common law unfair competition. [1]. Defendant asserted a counterclaim and numerous affirmative defenses. [31, 47]. Defendant later voluntarily dismissed Counts I and VI of its counterclaim, and this Court dismissed Counts II and V. [54, 61]. Thus, Defendant's remaining counterclaims are Counts III and IV, seeking cancellation of Plaintiff's mark for genericness and descriptiveness, respectively. [47].

The parties engaged in extensive discovery in the course of this litigation, and each consulted experts. In December 2016, Defendant disclosed its experts to Plaintiff. [183-2, 183-5]. It listed Doug Bania as an expert who "may be called to testify regarding the lack of consumer confusion" as to the parties' marks; whether Plaintiff's mark "is descriptive and has acquired distinctiveness"; and damages calculations. [183-5]. Defendant noted that Bania would provide a formal report. *Id*. Defendant's designation of experts also listed Kirk Martensen as a "non-testifying expert who will conduct a consumer survey" to provide evidence of consumer perspectives on the Capsule mark and the parties. *Id*. Defendant noted Martensen's association with Goldmarks—his survey firm—and said that although no "formal report" was forthcoming, Martensen might "be called to testify on the methodology of the survey if needed." *Id*. Upon Plaintiff's request, Defendant

provided a two-page summary of Martensen's credentials that same month. [157-18, 157-20]. Defendant sent Plaintiff a copy of the survey report, including information about its methodology and findings, with Defendant's expert disclosures. *See* [124-19] at 3–5, 15–24; [180-1] ¶ 2. Although Plaintiff never sought to depose Martensen, it asked Bania about Martensen and his methodology in a January 2017 deposition. [180-1] ¶ 9; [180-6]. In response, Bania admitted that he is not a survey expert but said that he accepted the reliability of the survey report, in part because it aligned with his own research. *See* [183-6] at 2.

In January 2017, this Court extended the initial expert discovery cut-off from February 2017 to March 14, 2017. [102]. On March 13, after Plaintiff's expert rebuttal report had been submitted and a day before the close of expert discovery, Bania submitted a "Supplemental Expert Report." [104-3]. Ultimately, this Court again extended expert discovery until June 1, 2017. [114].

The parties cross-filed for summary judgment in June 2017. [123, 147]. Defendant included Bania's expert report and Martensen's consumer survey as exhibits in support of its motion. [124-9, 124-19]. In response, Plaintiff challenged the admissibility of the consumer survey. *See* R. DSOF ¶ 28; [158] at 8. As a result, Defendant submitted a sworn declaration from Martensen in support of the consumer survey with its responses to Plaintiff's statement of additional facts. [171-8]. The affidavit described the work that Martensen and his firm Goldmarks conducted to produce the survey, and attested to the truth and validity of the consumer survey report previously disclosed to Plaintiff and submitted with Defendant's motion for summary judgment. *Id.*

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(f), courts may strike a party's "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   Accordingly, courts grant motions to strike only in rare circumstances; they are generally disfavored for their dilatory effect and frequent use as a vehicle to make arguments beyond the page limits of the merits briefs.  *See Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 726–27 (7th Cir. 2006).  A motion to strike should succeed when it removes "unnecessary clutter from the case," and thus expedites rather than delays resolution on the merits.  *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

A motion for summary judgment can be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The motion will be granted only if, viewing the record in the light most favorable to the nonmoving party, no jury could reasonably find in the nonmoving party's favor.  *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).  "The mere existence of a factual dispute," however, does not bar summary judgment unless "the disputed fact is outcome determinative under governing law."  *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987).  Summary judgment is also appropriate

if the nonmoving party fails to establish an essential element for which it bears the burden of proof at trial. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

## III. Analysis

### A. Evidentiary Disputes

Both parties bring numerous evidentiary challenges. These include Plaintiff's motion to strike Defendant's expert report [104]; Defendant's motion to strike Plaintiff's expert report [107]; Plaintiff's motion to strike Kirk Martensen's affidavit [177]; and Defendant's motion to withdraw four answers to Plaintiff's requests for admission [180]. Plaintiff also includes several related evidentiary arguments in its summary judgment briefing (and to the extent those arguments overlap with the listed motions, this Court addresses them with the related motion). This Court also addresses two of Plaintiff's arguments separately: Plaintiff's objections to Defendant's consumer survey, [158] at 8, and to the affidavits submitted by defense counsel and one of Defendant's employees, *id*. at 12–14.

Because parties "may rely only on admissible evidence" at summary judgment, *Lewis v. CITGO Petroleum Corp*., 561 F.3d 698, 704 (7th Cir. 2009), this Court considers the evidentiary disputes before turning to the merits of the case.

### 1. Motions to Strike the Expert Reports

Both parties move to strike their opponent's expert report and exclude the expert's opinions. Plaintiff moves to strike Doug Bania's supplemental expert report as untimely and improper, and to exclude his full report and testimony because he does not address issues in dispute and because he is not a qualified expert. [104] at 4, 6. Defendant seeks to exclude Chad Porter's report and opinions

because they are unreliable and conclusory. [107] at 3, 6, 8. Defendant's motion is denied as moot, as explained below. This Court considers Plaintiff's motion next.

The admissibility of expert testimony is governed by Federal Rule of Evidence (FRE) 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Expert testimony is admissible under FRE 702 if technical or specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." Essentially, district courts act as gatekeepers and must ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (internal quotation marks omitted). Relevant factors in this determination include testing, peer review, error rates, and acceptance by the relevant expert community. *See Daubert*, 509 U.S. at 593–94. The reliability inquiry is flexible, however, and not all of these factors will apply in every case. *See Kumho*, 526 U.S. at 141.

In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the expert's conclusions," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," *Daubert*, 509 U.S. at 595. The "soundness of the factual underpinnings" and "correctness of the expert's conclusions" may affect any ultimate determination on the merits, but do not govern admissibility. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718–19 (7th Cir. 2000). The expert must explain his or her methodology and cannot "simply assert a bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Finally, the expert "may be qualified by knowledge, skill, experience, training, or education." *See Smith*, 215 F.3d at 718 (internal

12

quotation marks omitted). District courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

(i)     **Bania's Supplemental Report**

Defendant engaged Bania to provide information and expert opinions on the parties' use of the Capsule trademark; the purpose and functionality of trademarks; and potential damages. [124-8] at 3. In addition to his initial expert report from December 2016, [124-8], Bania submitted a "Supplemental Expert Report" in March 2017, [104-3]. Plaintiff objects to the primary expert report as unreliable and irrelevant, and to the supplemental report for failure to comply with Federal Rule of Civil Procedure (FRCP) 26. This Court addresses the supplemental report first.

Under FRCP 26(e), parties must timely supplement their expert disclosures to remedy an incomplete or incorrect disclosure. *See* Fed. R. Civ. P. 26(e)(1–2); *Vill. of Sauk Vill. v. Roadway Express*, No. 15-cv-9183, 2017 WL 378424, at *2 (N.D. Ill. Jan. 25, 2017). Supplementary reports cannot offer "entirely new expert opinions"; rather, they should clarify or expand upon information in the expert's original report or "information given during the expert's deposition." *Id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 26(e)(2). The supplementary report may be intended in part to rebut an opposing party's expert. *Sauk Vill.*, 2017 WL 378424, at *2; *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, No. 08-cv-1083, 2010 WL 3894444, at *15 (N.D. Ill. Sept. 30, 2010). If offered in rebuttal, certain new arguments may be made "to repel testimony" of the opposing party's experts, as

long as they do not differ so substantially from the opening report that they introduce entirely new theories or angles. *Bone Care*, 2010 WL 389444, at *16. Finally, failure to comply with FRCP 26 may be excused under FRCP 37(c) if that failure is "substantially justified" or harmless.

For purposes of summary judgment, this Court finds that Bania's supplemental report sufficiently adheres to the scope of his initial report and to permissible rebuttal that it need not be stricken. The first half of the supplemental report corrects the scope of Bania's previous damages calculations but does not alter his underlying methodology. *See* [104-3] at 2–4. The second half rebuts Plaintiff's expert, but similarly confines itself to the calculation of damages, focusing on the issue of Spigen's costs as they relate to damages. *See id.* at 5–6. Bania previously addressed Spigen's costs in his initial report, [124-8] at 14–15, and here merely applies his analysis to Plaintiff's expert report. Such limited rebuttal does not open up new areas of the case or prejudice Plaintiff's ability to prepare for trial. *Cf. Stuhlmacher v. Home Depot USA, Inc.*, No. 2:10-cv-467, 2012 WL 5866297, at *3 (N.D. Ind. Nov. 19, 2012). Rather, it supplements Bania's original report, partly in response to Plaintiff's expert material. *See Sauk Vill.*, 2017 WL 378424, at *2.

Even if the supplementary report failed to strictly comply with Rule 26, this Court also finds any such failure harmless and thus excused under Rule 37. Not only was the supplementary report provided to Plaintiff before the initial close of expert discovery (albeit on the last day) [102], this Court then extended the close of expert discovery another two and a half months, [144], largely to give Plaintiff time to address the supplementary report, as stated in open court. Finally, Defendant's

14

production of the supplement does not venture into new territory, minimizing any potential prejudice to Plaintiff. *See Bone Care*, 2010 WL 389444, at *16. This Court denies Plaintiff's motion to strike Bania's supplementary report.

### (ii)    Bania's Initial Report

Plaintiff challenges Bania's qualifications and the relevance and reliability of his expert opinion overall, and seeks exclusion of his initial report and testimony at trial. [104] at 6; [148] at 25; [158] at 11. Plaintiff also challenges the reliability and admissibility of the consumer survey on which Bania relied for some of his opinions. *See* [148] at 14; [158] at 8–10. This Court first considers Plaintiff's primary challenges to Bania's report before turning to the consumer survey.

Plaintiff's objections to Bania's report rest solely upon a challenge to Bania's qualifications and methodology with respect to calculating damages. *See* [104] at 8–16; [148] at 25. For the reasons explained below, this Court does not reach the question of damages because it finds that Defendant did not infringe on Plaintiff's mark. Plaintiff's motion to strike Bania's report is, therefore, denied as moot.

As noted above, however, Bania's opinions extend beyond the issue of damages. His report also addresses the interaction of the parties' products in the marketplace. *See* [124-8] at 3, 13. Among other conclusions, Bania states that: (1) the parties' products are dissimilar; (2) a number of cell phone case suppliers use the term "Capsule" in the names of their cases; (3) consumers do not identify the Capsule mark with Uncommon; and (4) Defendant's use of "Capsule" likely did not interfere with Plaintiff's business. *Id*. at 7–12, 13. These opinions relate to Plaintiff's infringement claims and Defendant's counterclaim for cancellation of

Plaintiff's mark for descriptiveness. Thus, the admissibility of his report remains relevant.

Considering the "principles and methodology" that Bania used, *Daubert*, 509 U.S. at 595, and his "knowledge, skill, experience, training," and education, *Smith*, 215 F.3d at 718 (internal quotation marks omitted), this Court finds Bania's expert opinion admissible. Bania's qualifications include his professional experience as the founder of a consulting firm "specializing in the management, valuation and monetization" of intellectual property (IP); over a decade of work in IP management; his certification as a licensing professional in 2011; his membership in various trademark and licensing associations, as well as the American Bar Association's IP Law section; and a decade's worth of publications on copyright use, brand valuation, infringement claims, and other IP topics. *See* [124-9] at 25–30.

The methodology underpinning Bania's assessment of the parties' products and marks is not terribly complicated, but the questions he was asked to answer do not necessarily call for complexity. Because this case turns primarily on consumer perception of the parties' products and marks, Bania conducted a variety of internet searches to examine how the products and marks appear to consumers. *Id*. at 4–12. Bania then applied his knowledge and expertise to the results of those searches— which he conducted after wiping his internet search history to remove bias—and to Martensen's consumer survey report to arrive at his conclusions. *Id*. at 13, 18. This is a reasonable method for determining consumer perceptions. *See Ty, Inc. v. Publ'ns Int'l, Ltd.*, No. 99-c-5565, 2004 WL 5634301, at *7 (N.D. Ill. Oct. 21, 2004) (finding that an expert's reliance upon his experience and relevant studies offered a

"rational basis" for his conclusions on consumer motivations) (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408 (1940)); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 n.6 (7th Cir. 1992) (qualified expert's opinion on consumer understanding of trademarked term created genuine issue of material fact as to the mark's descriptiveness).

For the foregoing reasons, this Court will not strike Bania's expert report or exclude his opinions. But to the extent that some of those opinions rely upon the consumer survey, those portions of his report and opinions are only admissible if the survey itself is reliable and admissible, as discussed next.

## 2.    Martensen's Declaration

To determine the admissibility of the consumer survey—independently and as support for Bania's conclusions—this Court must first determine the admissibility of Martensen's declaration. For the reasons explained in this section, the consumer survey cannot be admitted unless it is introduced by the expert who conducted it. Although experts like Bania may generally rely upon studies conducted by other experts in forming their opinions, *see* Fed. R. Evid. 703, this is not the case when such studies involve discretionary expertise that the testifying expert lacks, *see Dura Auto. Sys. of Ind. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). As explained below, because Bania admits that he is not a survey expert, and because the consumer survey offered here involves discretion, the survey requires Martensen's testimony to be admissible at trial and his sworn support to be considered at summary judgment. Thus, this Court next considers Plaintiff's motion to strike Martensen's affidavit. [177].

17

Defendant submitted Martensen's affidavit with its responses to Plaintiff's statement of additional facts; it attests to the validity of the consumer survey conducted by Martensen's firm. [171-8]. Plaintiff objects to Martensen's declaration on three grounds: (1) Martensen cannot submit a testimonial affidavit because Defendant designated him as a nontestifying expert; (2) if Martensen is a testifying expert, Defendant failed to provide the expert report required by Rule 26; and (3) Plaintiff suffered harm from this undisclosed use of Martensen's testimony. [177] at 2, 5. Plaintiff therefore seeks to strike Martensen's affidavit and bar his opinions and testimony from consideration now and at trial. *Id*. at 1.

Because this Court finds no basis to exclude Martensen's declaration, and because Defendant's failure to adhere precisely to the letter of Rule 26 was harmless, the motion to strike Martensen's declaration is denied. Since Martensen's declaration constitutes the requisite support for the admission of Defendant's consumer survey, this Court sets out in detail the reason for this ruling.

Plaintiff's first argues that as a designated nontestifying expert, Martensen cannot offer any testimonial evidence, including a sworn declaration. [177] at 2. Plaintiff's sole support for this exclusionary rule is *Dura*, 285 F.3d 609. But *Dura* requires no such thing.

In *Dura*, the plaintiffs' sole named expert admitted in depositions that his analysis relied upon mathematical models that he lacked the expertise to evaluate. *Id*. at 611–12. The defendants used that admission to challenge the inclusion of the expert's testimony, and the plaintiffs responded with affidavits from the employees

at the expert's firm who created the models, attesting to their validity. *Id.* at 612. Defendants moved to strike those affidavits as untimely, arguing that the employees constituted new expert witnesses that the plaintiffs failed to disclose before the court's deadline. *Id.* The district court granted the motion to strike, and, because the original expert's testimony lacked sufficient reliability absent those affidavits, the court barred him from testifying as well. *Id.*

The Seventh Circuit affirmed, holding that the district court did not abuse its discretion in excluding the plaintiffs' expert. *Id.* at 616. The mathematical modeling involved such specialized, discretionary expertise that it could not be summarily relied upon by someone lacking that expertise, and required its own expert support. *Id.* at 615. In so ruling, the Seventh Circuit did not reject the clear meaning of FRE 703, which allows "an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert," without imposing any "*general* requirement that the other expert testify as well." *Id.* at 613. The Seventh Circuit was concerned, however, with a situation in which the "soundness of the underlying expert judgment is in issue," and held that where an underlying study is "not cut and dried" but involves "professional discretion," the person who produced the study must testify to its adequacy, *id.* at 613–14.

The models at issue in *Dura* were sufficiently discretionary to require testimony from their creators. *Id.* Since the employees who wrote them were not previously identified, but were necessary to establish the validity of the study, the district court reasonably treated them as previously undisclosed experts, whose new

reports as to their models were untimely. *Id.* at 612, 615. Had the mathematical models not required adaptations involving "a host of discretionary expert judgments," but instead been a matter of "routine," the outcome would have been different. *Id.* at 615.

Finally, the Seventh Circuit held that the district court reasonably found that the plaintiffs' untimely filing of additional expert reports was harmful and unjustified, so their failure to comply with Rule 26's disclosure requirements did not fall into Rule 37's safe harbor for "substantially justified" or "harmless" failures to disclose. *Id.* at 616; Fed. R. Civ. P. 37(c)(1). The plaintiffs should have known that the modeling was beyond their original expert's expertise; discovery had closed by the time the employees were finally named in the suit; and the withholding of the employees' names may have been strategic. *Dura*, 285 F.3d at 616.

As should be clear from this discussion, *Dura* affects Bania's ability to offer opinions based upon the consumer survey absent supporting testimony from Martensen, who created the survey. *Dura* does not, however, demand that Martensen's declaration be excluded. The Seventh Circuit affirmed the district court's exclusion of the supplementary affidavits because: (1) the district court reasonably treated the newly revealed employees' affidavits as untimely "experts' reports"; and (2) the district court reasonably found the late disclosure harmful. *Id.* at 612–13, 616. Thus, this Court must determine whether Martensen's declaration constitutes an expert report, and if so, whether its untimely production was harmful or unjustified.

On the first point, consumer surveys involve sufficiently discretionary expertise that they require the testimonial support of someone with expertise in that field. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 397, 394 (7th Cir. 1992) (discussing potential bias and discretionary choices in conducting consumer surveys); *Simon Property Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) ("Consumer survey results must be presented through expert witnesses."). Bania has admitted that he is not a survey expert and has not conducted "a lot of surveys." [183-6] at 2. Thus, the survey requires Martensen's testimony to support its admission. But the need for Martensen's testimony does not necessarily mean that his affidavit constitutes an untimely expert report.

Defendant's situation is similar to that of the plaintiffs in *Dura* in one key respect: both erroneously assumed that their experts could permissibly rely upon another's expertise, according to the general rule of FRE 703. Here, as in *Dura*, Defendant should have planned to have the original expert testify, and that expert should have provided a formal report as required by FRCP 26(a)(2)(B). But Defendant never provided such a report and it seems that Martensen's affidavit was not intended to be one: in large part it merely restates the summary of findings disclosed to Plaintiff in December 2016. *Compare* [171-8] ¶¶ 1, 3, 4, 5–8, 10, 11, *with* [124-19] at 3–5, 15–24. Unlike the affidavits in *Dura*, Martensen's affidavit bolsters previously provided information by including it in a sworn statement rather than merely offering it as an unsworn attachment; it does not significantly expand the record on the survey's methodology. Indeed, Defendant continues to

argue that Martensen need not provide an expert report because of his designation as a nontestifying expert.  [183] at 2.

In these circumstances, the affidavit does not constitute an expert report.  It is, however, a testimonial statement from a witness who was (erroneously) designated a nontestifying expert.  Contrary to Plaintiff's contention, there is no rule barring such statements from nontestifying experts.  *Dura* did not address this issue, and the few cases to do so have not held that the statement is barred, but rather that the privilege normally accorded to nontestifying experts under FRCP 26(b)(4)(D) is waived.  *See Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-CV-2226 SI (KAW), 2013 WL 1402337, at *2 (N.D. Cal. Apr. 5, 2013); *W. Res., Inc. v. Union Pac. R.R. Co.*, No. 00-2043-CM, 2002 WL 181494, at *8, 10 (D. Kan. Jan. 31, 2002); *Douglas v. Univ. Hosp.*, 150 F.R.D. 165, 168 (E.D. Mo. 1993).  Thus, were Martensen properly considered a nontestifying expert, he would have opened himself up to discovery by submitting the affidavit.  But the parties do not address the rescission of Martensen's privilege; the question they pose is whether any rule bars Martensen's affidavit, and this Court finds none.

Instead, the situation is this: Defendant erroneously designated Martensen as a nontestifying expert when, in fact, it needs his testimony to introduce the consumer survey report.  Because Martensen must testify, but Defendant never provided an expert report regarding his testimony, Defendant failed to comply with FRCP 26.  Thus, the final question is whether Rule 37 excuses that failure.

Rule 37(c)(1) provides that where a party fails to provide information about a witness as required by Rule 26, courts should exclude that information and witness

from consideration "unless the failure was substantially justified or is harmless." Whether a failure to comply with Rule 26(a) may be excused under Rule 37 is "left to the broad discretion of the district court," *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011), which may tailor any sanctions to the omission, *see Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). When applying Rule 37, courts consider: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Here, Defendant's failure to provide an expert report was harmless, mainly because Defendant made substantial, timely disclosures about both Martensen and the survey. Defendant included Martensen in its expert disclosure to Plaintiff in December 2016, stating that he would conduct a consumer survey that would inform Bania's opinions, and noting that although Martensen was considered a nontestifying expert, he might "be called to testify on the methodology of the survey if needed." *See* [183-5] at 2–3; [183-2]. Although this statement should have signaled to Defendant that Martensen needed to produce an expert report, it still gave Plaintiff clear notice of Martensen's potential testimony well before the close of expert discovery, let alone trial. *See* [114]. Moreover, Defendant included substantial detail about the survey's design and methodology in the findings report disclosed to Plaintiff in December 2016. *See* [124-19] at 3–5, 15–24. Finally, although Defendant did not provide as detailed a resume for Martensen as for

Bania, Defendant gave Plaintiff a two-page summary of his credentials at that time. *See* [157-18] (indicating receipt by December 7, 2016); [157-20].

In light of these disclosures, this Court finds no likelihood of surprise to Plaintiff as to the nature or substance of Martensen's testimony, or of the consumer survey. This minimizes the prejudice to Plaintiff, who, in any event, had ample opportunity to depose Martensen and did not do so. Designating Martensen a nontestifying expert did not shield him from discovery: where a nontestifying expert's report forms the basis for an expert's opinion, the nontestifying expert may be deposed. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii), (b)(4)(A); *Estate of Manship v. United States*, 240 F.R.D. 229, 238 (M.D. La. 2006); *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 30–32 (W.D.N.Y. 2002); *Derrickson v. Circuit City Stores, Inc.*, No. DKC 95-3296, 1999 WL 1456538, at *7 (D. Md. Mar. 19, 1999), *aff'd on other grounds sub nom. Johnson et al. v. Circuit City Stores*, 203 F.3d 821 (4th Cir. 2000); *Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd.*, 154 F.R.D. 202, 208 (N.D. Ind. 1993); *Eliasen v. Hamilton*, 111 F.R.D. 396, 401 (N.D. Ill. 1986) (discovery into nontestifying experts permissible where the party seeking discovery is unable to obtain equivalent information from other sources). Ample warning and failure to seek additional information supports the application of Rule 37's safe harbor. *See David*, 324 F.3d at 857.

Finally, this Court cannot conclude that Defendant acted in bad faith given the spectrum of discretionary expertise that *Dura* and FRE 703 create—on one end, "routine" studies and surveys may be relied upon by testifying experts; on the other, "discretionary" surveys must be supported by testimony from their creators. *Dura*,

285 F.3d at 615. Defendant misread the spectrum, but still provided sufficient information so that no "tactic of surprise" could have affected "the outcome of the case." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000).

Under such circumstances, Defendant's failure to strictly comply with Rule 26(a)'s expert report requirement as to Martensen was harmless. Moreover, submitting Martensen's affidavit did not harm Plaintiff because the affidavit primarily restated information that Defendant had previously disclosed. This Court declines to strike Martensen's affidavit, or exclude his statements and testimony.

Because Martensen's affidavit and testimony are admissible, this Court will also admit the consumer survey Martensen produced, provided it is sufficiently reliable and complies "with the principles of professional survey research." *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007).

### 3.     The Consumer Survey

Plaintiff seeks to exclude the consumer survey that Martensen produced and Bania relied upon because "no expert has opined regarding the methodology employed." [148] at 14. As discussed above, however, the survey findings disclosed to Plaintiff in December 2016 contained significant information on the methodology of the survey. [124-19]. Martensen's affidavit, which this Court has admitted, provides sworn support for that information. [171-8]. No categorical bar prevents admitting the consumer survey under these circumstances, nor does Plaintiff point to any. Rather, the admissibility of the survey turns on its reliability, which this Court will now consider.

The Seventh Circuit has said that for a consumer survey to be admissible, it

"must comply with the principles of professional survey research," *Evory*, 505 F.3d at 776, and should not rely upon "leading or suggestive" questions, *Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 625–26 (7th Cir. 2009). A reliable survey must "replicate market conditions" and remain free of bias. *Spraying Sys.*, 975 F.2d at 396. Courts in this district have supplemented those general principles by considering factors drawn from cases cited with approval by the Seventh Circuit, including: "whether (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and nonleading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured." *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1017 (N.D. Ill. 2013). Courts rarely exclude consumer surveys from evidence, since most "shortcomings" go to "the proper weight of the survey" rather than admissibility. *AHP Subsidiary Holding Co. v. Stuart Hale, Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

### (i) The Universe and Sampled Population

Selecting the right universe of respondents significantly affects the probative value of a consumer survey. *See Spraying Sys.*, 975 F.2d at 394 n.5. An "erroneous or undefined" universe diminishes the survey's reliability. *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d 997, 1008 (N.D. Ill. 2010). Once the universe is

defined, a sample population must be selected "that accurately represents the universe." *Id.*

Here, the survey report identifies its universe as consumers of cell phones and cell phone cases who do not work for a cell phone or cell phone accessory business, or a "marketing agency, research or media company." [124-19] at 3. This is a relevant universe to this case, which turns on the perceptions of consumers of cell phone cases. The report notes that the sample was selected by Precision Sample, LLC, "a leading provider of respondents for consumer surveys." *Id.* While this does not give the Court much information to independently evaluate the sampling, the use of a qualified third-party sampler could increase the impartiality of the survey. Moreover, in the context of the consumer universe for this case, any random sampling of cell phone case consumers is likely to be as reliable as any other, since cell phone cases have a broad, national market that crosses most demographic boundaries. *Cf. Competitive Edge*, 763 F. Supp. 2d at 1008 (considering only college students in consumer survey of calculator consumers was underinclusive); *see also Bobak Sausage Co. v. A&J Seven Bridges, Inc.*, No. 07-C-4718, 2010 WL 1687883, at *6 (N.D. Ill. Apr. 26, 2010) (questions narrowing respondents to likely consumers helped create an appropriate universe). The universe of respondents is therefore sufficiently reliable.

### (ii) The Questions

The next factor asks whether the questions given to survey respondents were clear, precise, and nonleading. *Dyson*, 951 F. Supp. 2d at 1017. The questions used in this survey satisfied these conditions. *See* [124-19] at 15–23. The phrasing is

unambiguous, *see, e.g.*, *id.* at 16 ("Can you recall the brand name of the case of your primary cell phone?"), and the questions allow consumers a range of response options where appropriate, rather than forcing "yes" or "no" answers, *see id.* at 18; *Competitive Edge*, 763 F. Supp. 2d at 1008–09.  Nor are the questions biased or leading: the survey randomized answers in multiple choice questions and did not unduly emphasize either party's brand name, mark, or product.  *See* [124-19] at 19–20; *cf. Bobak Sausage*, 2010 WL 1687883, at *6 (survey improperly suggested answers by emphasizing certain choices).

Finally, the questions are reasonably designed to identify consumer perceptions of the term "Capsule" in relation to cell phone cases, which is relevant to the strength and protectability of Plaintiff's mark, as discussed below.  The fact that the survey does not appear to have included images of the products somewhat weakens its value, given the relevance of the mark's appearance to consumer confusion, but does not seriously undermine it since the "Capsule" mark has no particular visual content.  Rather, both parties merely use similar, sans-serif fonts. *See* [149-11]; [149-18]; [149-19]; [124-12].  And, since the survey provides evidence as to whether "Capsule" achieved a "secondary meaning" with consumers—which requires that consumers identify the trademark "as the name of the product," *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001)—presenting "Capsule" with minimal context is a valuable measure of its stature in the market.

Thus, the questions are sufficiently reliable to support admission of the survey.  *See McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986) (The "manner of presentation to the interviewee goes to the weight to be

accorded to the survey results rather than providing a reason to ignore the survey evidence altogether.").

### (iii)  Interview Procedures

This factor addresses whether the interviewers followed professionally "sound" procedures so as to minimize the potential for procedural bias. *See Dyson*, 951 F. Supp. 2d at 1017. This Court has little information on this point, other than the fact that Goldmarks conducted the survey online through the third-party platform SurveyMonkey, [124-19] at 4, and "complied with the general principles of professional survey research," per Martensen's sworn statement, [171-8] ¶ 5. Despite the meagerness of the record on this point, it is difficult to see how an online survey suffers the risk of bias presented by human interviewers, which is what this factor seeks to identify. Here, this Court will not exclude the survey for lack of further information when the available information offers no reason to doubt the survey's impartiality. *See Bobak Sausage*, 2010 WL 1687883, at *8 (admitting consumer survey even though sparse record raised some doubts as to its design).

### (iv)  Accurate and Objective Data

The record shows the same flaws in this factor as in the previous one. Little information exists about the survey's method of calculating and reporting data, other than that the information collected through SurveyMonkey was converted into percentages, *see* [124-19] at 4, 6–13, and was "accurately gathered and reported," according to Martensen, [171-8] at 6. Again, however, the format and approach of the survey is relatively simple and this Court has no reason to doubt the effectiveness of this "no-frills" approach, which does not appear to have required

sophisticated algorithms or data coding. *See Bobak Sausage*, 2010 WL 1687883, at *8; *cf. Dyson*, 951 F. Supp. 2d at 1020 (scrutinizing coding undertaken by human coders subject to bias).

### (v)    Summary

In sum, this Court finds that Defendant's consumer survey is not "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *Stuart Hale, Co.*, 1 F.3d at 618. Rather, its shortcomings go "to the weight to be accorded to the survey results rather than providing a reason to ignore the survey altogether." *Id.* (quoting *McGraw-Edison Co.*, 787 F.2d at 1171–73).

### 4.    Defendant's Additional Affidavits

Plaintiff next challenges affidavits submitted by defense counsel [124-57], and Defendant's manager Sang Jun [124-59], for lack of personal knowledge, [158] at 12-14. FRCP 56(c)(4) requires that affidavits made in support of a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant" is "competent to testify on the matters stated." Personal knowledge includes inferences and opinions, but these "must be grounded in observation or other first-hand personal experience." *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); *see also EEOC v. Admiral Maint. Serv., L.P.*, 174 F.R.D. 643, 647 (N.D. Ill. 1997). Mere speculation about "matters remote from that experience" fails to conform to the rule. *Visser*, 924 F.2d at 659.

With respect to the affidavit from defense counsel [124-57], Plaintiff specifically challenges paragraphs 9 and 55, describing defense counsel's web search

for the parties' Capsule products and Plaintiff's failure to use the ® designation with its mark on certain of those products. [158] at 13. There is no paragraph 55 in this affidavit, but this Court understands Plaintiff to object to paragraph 4, which addresses Plaintiff's use of the ® designation. *See* [124-57] ¶ 4. Paragraph four relates to counsel's observation of an image of Plaintiff's product, contained in the record, which is a permissible inference based upon personal observation. *See Admiral Maint.*, 174 F.R.D. at 648. Paragraph nine describes counsel's search for Plaintiff's products on Amazon.com in May 2017, and attests that the search results included as Exhibit 22 [124-23] are "true and correct copies" of his search results. [124-57] ¶ 9. This is the definition of personal knowledge, since counsel himself conducted the search. This Court declines to strike paragraphs four and nine of defense counsel's affidavit.

With respect to Sang Jun's affidavit, this Court finds that one of Jun's statements is not clearly the result of personal knowledge, and Defendant has therefore failed to that Jun is "competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Although it may sometimes be inferred that the affiant had knowledge of certain events based upon his position within an organization and involvement in relevant circumstances, *Ladenberger v. Gen. Signal Pump Grp./Aurora Pump*, No. 00-c-4054, 2001 WL 586497, at *1 (N.D. Ill. May 31, 2001) (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)), this is not the case with paragraph eight of Jun's affidavit. Although Jun is Defendant's "Manager of General Affairs" and oversees "day to day operations," [124-59] ¶ 1, this does not explain how he knows that Spigen "has developed a reputation" for

"high quality and minimalist design," *id.* ¶ 5. Although this statement cites Defendant's expert report, it must more clearly point to the source of this knowledge or at least indicate that Jun examined the report.

With respect to paragraph 10 of Jun's affidavit, it is clear that Jun concluded that the term "capsule" is used by other cell phone case manufacturers based upon his review of Defense Exhibit 9 [124-10], showing capsule-labeled cell phone cases sold by third parties. As noted, inferences from matters in the record are permissible under Rule 56. *See Admiral Maint.*, 174 F.R.D. at 648. The remainder of Jun's statements relate to Spigen's ordinary business practices and this Court infers that they draw upon his personal knowledge as Spigen's manager. *See Ladenberger*, 2001 WL 586497, at *1. This Court therefore strikes paragraph eight of Jun's affidavit, but admits the remaining statements.

### 5. Defendant's Motion to Withdraw Answers

Defendant seeks to withdraw its answers to numbers 18, 23, 24, and 47 of Plaintiff's requests for admission (RFAs). [180]. FRCP 36(b) gives district courts discretion to "permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party." The party seeking to withdraw its admissions must show good cause. *Howard v. Sheahan*, 546 F. Supp. 2d 566, 568 (N.D. Ill. 2008). Even if these prerequisites are met, courts may refuse to permit withdrawal. *See United States v. Kasuboski*, 834 F.2d 1345, 1350 n.7 (7th Cir. 1987) (Admissions may be withdrawn under Rule 36(b) "if certain conditions are met and the district court, in its discretion, permits the withdrawal.").

This Court grants Defendant's request to withdraw its response to RFA 18. RFA 18 asked Defendant to admit that the "term 'CAPSULE' as used by Spigen and Uncommon's CAPSULE mark are identical in appearance." [149-8] at 6. This Court first notes that this RFA is problematic because it essentially aims "to establish the ultimate legal question." *McNary v. Hamer*, No. 14-cv-01897-WTL-TAB, 2016 WL 4140945, at *2 (S.D. Ind. Aug. 4, 2016). More importantly, Defendant's response contains an erroneous denial, controverted by the evidence, that it used the trademarked term "Capsule" alone. *See* [149-8] at 7; R. PSOF ¶ 9; [149-11] at 2. Thus, the merits of the case are aided by the withdrawal of this denial. The withdrawal cannot prejudice Plaintiff, since Defendant's use of "capsule" alone more closely resembles Plaintiff's mark, and thus favors Plaintiff's infringement claim.

This Court denies, however, Defendant's request to withdraw its responses to RFAs 23, 24, and 47. In response to RFAs 23 and 24, Defendant admitted that its products were similar and/or identical to Plaintiff's. [149-8] at 10. Defendant now seeks to withdraw both admissions on the grounds that the distinct coloration and designs on the parties' cell phone cases render the products distinct. [180] at 5–6. This is contrary to the law governing product similarity, which asks whether consumers are likely believe that "a single source could produce both" products, *McGraw-Edison Co.*, 787 F.2d at 1169, and if the products are competitive, *see Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1000 (N.D. Ill. 1997). The decorative aspect of these cases affects neither inquiry. The parties' cases could replace one another and are thus competitive, *id.*, and a single company could

produce more than one kind of cell phone case. Thus, Defendant's request for withdrawal relies upon a distinction unsupported by law.

In Defendant's response to RFA 47, Defendant admitted that "it does not appear SPIGEN used the term 'CAPSULE' prior to" Plaintiff's first use of the mark in December 16, 2009. [149-8] at 15. Now Defendant argues that its earlier use of "capsule" to describe a decorative pattern of medicine capsules on a cell phone sticker proves this admission false. [180] at 7. This Court has already discussed why the use of the cell phone sticker is largely irrelevant to the merits of this case. To the extent that it is relevant, Plaintiff would be prejudiced by its withdrawal at this late hour. Plaintiff cited this admission in its briefing, *see, e.g.*, [148] at 19, which represents "detrimental reliance" upon the admission, *see Matthews v. Homecoming Fin. Network*, No. 03-c-3115, 2006 WL 2088194, at *3 (N.D. Ill. July 20, 2006) (internal quotation marks omitted). Moreover, the fact that Defendant waited to amend its answer for over a year after it submitted its supplemental responses to Plaintiff's RFAs, *see* [180-2] at 19, and after the parties' motions for summary judgment were fully briefed, strongly indicates unfair prejudice to Plaintiff, *see Matthews*, 2006 WL 2088194, at *3; *Tidwell v. Daley*, No. 00-c-1646, 2001 WL 1414229, at *1 (N.D. Ill. Nov. 8, 2001). If Defendant was able to supplement its responses to Plaintiff's interrogatories on this issue in 2016, [180-6], it could and should have moved to amend this answer at that time. Having shown no cause for this delay, Defendant's motion is denied as to RFA 47. *See Howard*, 546 F. Supp. 2d at 568; *Matthews*, 2006 WL 2088194, at *3.

## B.     Validity of Plaintiff's Mark

Defendant's two extant counterclaims seek the cancellation of Plaintiff's mark for genericness and descriptiveness, respectively. [47]. "Courts classify marks into five categories of increasing distinctiveness: (i) generic; (ii) descriptive; (iii) suggestive; (iv) arbitrary; and (v) fanciful." *Box Acquisitions, LLC v. Box Packaging Prods., LLC*, 32 F. Supp. 3d 927, 934 (N.D. Ill. 2014) (citing *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998)). Generic terms receive no trademark protection, while a descriptive mark only receives trademark protection "if it acquires secondary meaning in the collective consciousness of the relevant community." *Platinum*, 149 F.3d at 727 (internal quotation marks omitted). Terms in the other three categories receive protection "automatically" because "they are inherently distinctive." *Id.* A district court's determination as to where a mark falls "on the continuum between generic and arbitrary" is "often made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation." *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 674 (7th Cir. 1982).

Here, Defendant contends that Plaintiff's mark is either generic or descriptive, and should be canceled in either case because the mark lacks secondary meaning. [125] at 9–13. Plaintiff argues that it is entitled to the presumption that its mark is at least suggestive because the USPTO approved its registration. [148] at 8. Plaintiff is correct that registration entitles its mark to a presumption of validity. 15 U.S.C. § 115(a). But Defendant may overcome that presumption "with evidence that the mark is generic or descriptive, or that it lacks secondary

meaning." *Packman*, 267 F.3d at 639. Thus, Defendant bears the burden of demonstrating that the mark is either generic or descriptive, and, if descriptive, that it lacks secondary meaning. *Id.*; *see also Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 485 (7th Cir. 2007) (registered mark presumed to have secondary meaning); *Scandaglia v. Transunion Interactive, Inc.*, No. 09-c-2121, 2010 WL 3526653, at *6 n.1 (N.D. Ill. Sept. 1, 2010) (party contesting the mark must show that the mark lacks secondary meaning).

Courts have the authority to cancel invalid marks. 15 U.S.C. § 1119. Indeed, in such circumstances "cancellation is not merely appropriate, it is the best course." *Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007); *see also Specht v. Google, Inc.*, 747 F.3d 929, 936 (7th Cir. 2014). A registered mark may be canceled at any time for genericness; a descriptive mark may be canceled if the challenger shows that it lacks secondary meaning and provided the mark has not become incontestable by remaining in continuous use for five years from its date of registration. *See* 15 U.S.C. §§ 1115, 1064, 1065; *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985); *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 547 (5th Cir. 2015); *Ashland Oil, Inc. v. Olymco, Inc.*, 64 F.3d 662, at *2 (6th Cir. 1995).

### 1.    **Plaintiff's Mark is Not Generic**

Count III of Defendant's counterclaim seeks cancellation of Plaintiff's mark for genericness. [47] at 16. "A generic term is one that is commonly used as the name of a kind of goods." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986). It does not identify a product's source but "merely specifies

the genus of which the particular product is a species." *Id.* Because it is "commonly used to denote the product, a common source of evidence is the dictionary." *Id.*

Plaintiff's mark is not generic. "Capsule" is not "commonly used to denote" cell phone cases, nor does it clearly specify the broader "genus" of which cell phone cases are a species. *Id.* Moreover, Defendant has the burden of proving that the mark is generic, *id.* at 938, and Defendant has not pursued this counterclaim in its motion for summary judgment, let alone offered evidence to support it, *see* [125]. Therefore this argument is waived, *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016), and this Court grants summary judgment to Plaintiff on Count III of Defendant's counterclaim, *Celotex*, 477 U.S. at 322–23.

### 2. Plaintiff's Mark is Descriptive

Count IV of Defendant's counterclaim asserts that Plaintiff's mark is merely descriptive and therefore not protectable unless it has a secondary meaning. [47] at 17. Plaintiff argues that its mark is at least suggestive and thus entitled to automatic protection. [158] at 19–20.

A descriptive mark "ordinarily names a characteristic of a product or service." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 724 (7th Cir. 2015). Descriptive terms "are generally not protectable as trademarks," in part "because they are poor means of distinguishing one source of services from another." *Liquid Controls*, 802 F.2d at 936. The distinction between a descriptive and a suggestive mark is that a descriptive mark "imparts information directly," while a suggestive mark "stands for an idea which requires some operation of the imagination to connect it with the goods." *Platinum*, 149 F.3d at 727 (internal quotation marks omitted). An example

of a suggestive mark is "Tide," which requires imagination to be connected with soap. *See Sands*, 978 F.2d at 953. Courts evaluate whether a mark is suggestive or descriptive from the perspective of the consumer. *Id.*

Plaintiff's registered trademark triggers the presumption that it is not descriptive and Defendant has the burden "not only to overcome" that presumption "but also to show that there is no genuine issue of material fact" as to descriptiveness. *See Liquid Controls*, 802 F.2d at 937. But once a defendant produces sufficient evidence to "burst" the presumption, the plaintiff can no longer "rely on that presumption to defeat" a motion for summary judgment. *Id.* at 938. To prove descriptiveness, parties may offer dictionary definitions, evidence on the term's use in the relevant industry, or direct evidence of consumer perceptions. *See Platinum*, 149 F.3d at 727; *Sands*, 978 F.2d at 952–53; *M.B.H. Enters., Inc. v WOKY, Inc.*, 633 F.2d 50, 55 n.6 (7th Cir. 1980).

Here, Defendant offers dictionary definitions; a finding by the USPTO that "Capsule" is descriptive as applied to cell phone cases; and relatively common use of the term among cell phone case suppliers. [125] at 8; DSOF ¶ 8; [124-4] at 6. Despite this somewhat sparse record, this Court has no trouble concluding that "capsule" is descriptive as applied to cell phone cases. The Oxford English Dictionary defines capsule as a "little case or receptacle." *Capsule*, OXFORD ENGLISH DICTIONARY, OED Online (last visited Nov. 17, 2017). Webster's defines it as "a small case, envelope, or covering." [124-2] at 2. Capsule therefore "specifically describes a *characteristic*" of Plaintiff's cell phone case, which is all that it need do to be considered descriptive. *Sands*, 978 F.2d at 952.

This Court disagrees with Plaintiff that the move from "capsule" to cell phone case requires a "mental leap" of the kind required by suggestive terms. [158] at 19. It is "not necessary that a descriptive term depict the product itself, but only that the term refer to a *characteristic* of the product." *Sands*, 978 F.2d at 952 (internal quotation and punctuation marks omitted). This is what is meant by the rule that descriptive terms "impart information directly." *Packman*, 267 F.3d at 641. Here, "capsule" directly imparts information about a characteristic of Plaintiff's product: namely, that it is a case or covering. "Capsule" thus resembles "Work-N-Play," which merely described a van used "for work and for play," *Custom Vehicles*, 476 F.3d at 483, and "Thirst Aid," which described a thirst-quenching drink, rather than "Tide," which required substantial imagination to summon any idea of soap and was not a characteristic of soap, *see Sands*, 978 F.2d at 952. Accordingly, this Court finds that "capsule" is descriptive of cases for small electronic goods.

### 3. Secondary Meaning

A descriptive term may nevertheless be protected if it has acquired secondary meaning. *Platinum*, 149 F.3d at 728. "Secondary meaning exists only if most consumers have come to think of the word not as descriptive at all but as the name of the product." *Packman*, 267 F.3d at 639 (internal quotation marks omitted). Factors used to assess whether a term has secondary meaning include: "(1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Platinum*, 149 F.3d at 728. Lengthy, exclusive use of a mark can create secondary meaning, but the inquiry remains whether consumers understand that the relevant term "has come

to mean" that "those products or services are the company's trademark." *Id.* Because Plaintiff's mark is registered, it is presumed to have secondary meaning. *Packman*, 267 F.3d at 638–39. Thus, although this Court appreciates "the difficulties of proving a negative," *Liquid Controls*, 802 F.2d at 938–39, Defendant must show that the mark lacks secondary meaning, *Packman*, 267 F.3d at 638–39.

Here, Defendant offers evidence that Plaintiff's use of the term Capsule has not been exclusive. Defendant has used "Capsule" at least since 2010—only a year after Plaintiff's first use—and it is also used by other cell phone case suppliers. *See* PSOF ¶ 6; [1-6]; [124-10]. Further, Plaintiff has, at best, used the term for under eight years; even though it is not impossible that secondary meaning could arise in that time, this case falls closer on the spectrum to five years (which casts "serious doubt upon the very possibility" of establishing a "strong secondary meaning") than fifty years (which is better proof of an established brand). *Gimix, Inc. v. JS&A Grp., Inc.*, 699 F.2d 901, 907 (7th Cir. 1983). Moreover, if the period of Plaintiff's exclusive use is less than a year (as evidenced by Plaintiff's first use in 2009 and Defendant's 2010 introduction of Capsule products), that fact provides a significant reason to doubt that the mark achieved secondary meaning, *id.*, particularly in a market replete with similar products, *see Custom Vehicles*, 476 F.3d at 484 (noting the difficulty of establishing secondary meaning in a competitive market for similar products). Such evidence tends to rebut the presumption of secondary meaning.

Defendant next argues that Plaintiff's advertising efforts were "minimal," and that its sales have dropped since Plaintiff stopped making the Capsule model for new iPhone generations. [125] at 11. As to advertising, it is far from clear that

Plaintiff's efforts were minimal. The record shows that Plaintiff hired a marketing firm, used Google ads, ran traditional ads, and sought celebrity placements. *See* R. DSOF ¶¶ 24–25; [124-14]. Plaintiff does concede that it used Google ads only briefly because they were not successful. R. DSOF ¶ 25.

As to sales, Defendant's sole evidence is that Plaintiff ceased making the Capsule model for iPhone generations after the 5/5s, but Defendant fails to connect that fact to reduced sales. *See* DSOF ¶¶ 43, 44. Defendant offers evidence of Plaintiff's sales from July 2010 to March 2011, [128], but this hardly covers the full period of Plaintiff's Capsule sales, and in any event Defendant provides no evidence allowing this Court to assess the relative strength of such sales in the cell phone case market. Thus, these factors do not serve to rebut the presumption of secondary meaning accorded to Plaintiff's mark.

The foregoing factors are "circumstantial" evidence of secondary meaning. *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988). "Consumer testimony and consumer surveys are the only direct evidence" of secondary meaning. *Id.* Defendant produced the only consumer survey in the record. [124-19]. The survey shows that among consumers of cell phones and cell phone cases—excluding employees in the industry—only 6 percent of respondents were familiar with "Capsule" as a brand name (compared with over 60 percent familiar with the competing case brand "OtterBox"). *Id.* at 10. Only 14 percent of respondents could connect "Capsule" to cell phone cases when prompted. *Id.* at 11. As such, the survey indicates that, far from "Capsule" having "come to mean" a cell phone case in the minds of consumers, it has barely registered with consumers.

Thus, Plaintiff's product does not enjoy "a *mental association* in buyers' minds between the alleged mark and a single source of the product." *Packman*, 267 F.3d at 641 (internal quotation marks omitted). Based upon the record, Plaintiff's mark has not acquired a secondary meaning.

In sum, Defendant meets its burden of showing that Plaintiff's mark is merely descriptive and lacks secondary meaning. *See id*. at 639, 641–42. The date of registration for Plaintiff's mark is May 21, 2013; it therefore has not been in continuous use for five years and has not become incontestable. *See* [149-3]; 15 U.S.C. § 1065. Accordingly, descriptiveness remains a valid basis upon which Defendant may seek cancellation of Plaintiff's mark. *See* 15 U.S.C. § 1115(a); *Park 'N Fly*, 469 U.S. at 196; *Ashland Oil*, 64 F.3d 662, at *2, 5. Because Plaintiff's mark is merely descriptive and lacks secondary meaning, it is invalid, *see Gimix*, 699 F.2d at 907–08, which makes cancellation "the best course," *Cent. Mfg.*, 492 F.3d at 883.

This Court therefore grants summary judgment to Defendant on Count IV of its counterclaim, [47] at 17, and orders the USPTO to cancel U.S. Trademark Registration No. 4,338,254, *see* 15 U.S.C. § 1119.

## C. No Likelihood of Confusion

This Court's conclusion that the "Capsule" mark is descriptive and void of secondary meaning disposes of Plaintiff's infringement claims in addition to Defendant's counterclaims. *See Packman*, 267 F.3d at 642. As an alternate basis for this Court's ruling on Plaintiff's claims, this Court finds that Defendant did not infringe on Plaintiff's mark because there is no likelihood of consumer confusion.

Plaintiff's claims are for federal trademark infringement under 15 U.S.C. § 1114(a); unfair competition and false designation of origin under 15 U.S.C. § 1125(a); and Illinois common law unfair competition. [1]. Both federal claims require Plaintiff to show that: (1) Plaintiff holds a protected right in the mark; and (2) Defendant's use is likely to confuse consumers or deceive the public. *See S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 804 (N.D. Ill. 1998); *see also Packman*, 267 F.3d at 639 (requirements for § 1114 claims); *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989) (discussing § 1125 claims). In Illinois, the common law tort of unfair competition applies to a broader range of conduct, but here also "depends upon likelihood of confusion as to the source of plaintiff's goods when the whole product, rather than just the service mark, is considered." *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 113 (Ill. App. Ct. 1984); *see also James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274–75 (7th Cir. 1976) (both § 1114 and Illinois common law infringement claims turn on consumer confusion). Thus, Plaintiff must show a likelihood of consumer confusion caused by Defendant's use of "Capsule" to prevail on all three of its claims.

The Seventh Circuit has identified seven factors to assess whether Defendant's use of the trademarked term is likely to confuse consumers: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another."

*Packman*, 267 F.3d at 643. No single factor is dispositive but "in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *Id*. Confusion is a question of fact but may be decided at summary judgment where the evidence is "so one-sided that there can be no doubt about how the question should be answered." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).

### 1.   The Marks are Not Confusingly Similar

Courts evaluate the similarity of two marks "in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) (internal quotation marks omitted). Taking market conditions into account, courts determine if the marks are "similar in sound, appearance, meaning, and connotation." *S Indus.*, 12 F. Supp. 2d at 813 (internal quotation marks omitted). Relevant considerations include "the appearance and placement" of the marks, different "packaging, coloring, and labeling," *Packman*, 267 F.3d at 644, and the "use of a prominent brand name" with the mark, *G. Heileman Brewing*, 873 F.2d at 999.

Here, it is indisputable that both parties use the trademarked term Capsule, both alone and in combination with other words or phrases. *See* [149-11] (Spigen packaging with "Capsule" alone); [149-19] (Spigen products sold as "Ultra Fit Capsule," "Case Capsule Solid," and others); [124-12] (Uncommon products sold as "Capsule Case"); [124-28] (Uncommon product sold as "Capsule"). The term is thus the same in sound, meaning, and connotation, and appears in a similar sans-serif font, either at the bottom of physical packaging or next to a picture of the product

when sold online. *See* [124-12]; [149-11]; [149-18]; [149-19]. These factors weigh in favor of the marks' similarity. *See Packman*, 267 F.3d at 644; *see also S Indus.*, 12 F. Supp. 2d at 813–14.

But viewing the marks "from a consumer's marketplace vantage point," as this Court must, "the similarities diminish." *S Indus.*, 12 F. Supp. 2d at 814; *see also James Burrough*, 540 F.2d at 275. In every example of the parties' products contained in the record, the parties display their respective brand names and logos prominently in conjunction with the mark. *See, e.g.*, [124-12], [124-30], [149-11]. On both parties' packaging, the branding and logo are more prominent than the Capsule mark, which, as described above, often appears in a smaller font size at the bottom of the packaging. *Id.* The coloring of the packaging echoes each parties' brands (blue and white or black for Plaintiff; black and orange for Defendant), further diminishing the likelihood of confusion. *See Packman*, 267 F.3d at 644; *Zeibert Int'l Corp. v. After Mkt. Assocs.*, 802 F.2d 220, 227 (7th Cir. 1986) (use of different colors with disputed marks reduces likelihood of confusion as to source). Indeed, the only instance Plaintiff points to where the mark is used without a brand name is a product listing *on its own website*, where, in fact, Plaintiff's logo appears at the top of the page. *See* R. DSOF ¶ 47; [124-28].

Once a consumer has arrived at a seller's dedicated website, little to no danger exists that the consumer will be confused as to the source of the product he or she is purchasing. *See Door Sys.*, 83 F.3d at 174 (because trademarks are "merely an identifier of source," competitors can use the mark "provided there is no likelihood" that the source will be confused). On third-party sites like Amazon,

where some of the parties' products are sold, brand names always appear next to the product names, again reducing the likelihood of confusion. *See* [1-6]. While the question is admittedly a closer one with respect to such third-party retailers (since the parties' logos and colors are not always visible in search results), the fact that the brand name appears before the mark, along with a host of individualizing descriptors of the products, weighs against finding similarities likely to cause confusion.

Finally, because—as discussed above—this Court considers "Capsule" a weak, descriptive mark, Defendant's use of Capsule in combination with other terms has "less significance" for potential infringement. *S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 878, 890 (N.D. Ill. 1998) (quoting *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983)). This, of course, only applies to those products using Capsule in conjunction with other terms.

Overall, considering the disputed Capsule products in their market conditions, this Court finds that their distinct "packaging, coloring, and labeling," *Packman*, 267 F.3d at 644, and "use of a prominent brand name" with the mark, *G. Heileman Brewing*, 873 F.2d at 999, minimizes the similarity of the marks, *Zeibert*, 802 F.2d at 227 ("Prominent display of different names on the marks" can "reduce the likelihood of confusion even where . . . the marks are otherwise similar.").

## 2.     The Products are Similar

Despite Defendant's contention that Plaintiff's customization option distinguishes its product, [125] at 22, the parties' products—cell phone cases—are clearly similar. Two products are similar when they are "the kind the public

attributes to a single source." *Ty, Inc.*, 237 F.3d at 899. Consumers could certainly believe that "a single source could produce both" types of cases, *McGraw-Edison Co.*, 787 F.2d at 1169, and the cases are competitive because a consumer could replace one with the other, *see Knaack*, 955 F. Supp. at 1000.

That said, consumers are, in the context of the market for cell phone cases, unlikely to believe that Defendant's and Plaintiff's products actually come from the same source. This is due to the distinct appearance of the marks and because, with countless cell phone cases on the market from a wide range of suppliers, *see* [124-10], no consumer is likely to assume that any two cell phone cases come from the same manufacturer unless the branding indicates this to be true, *cf. Ty, Inc.*, 237 F.3d at 899–900 (finding the fame of the "Beanie" mark together with plaintiff's previous licensing of the mark increased likelihood that consumers would attribute the defendant's "Beanie Racers" to plaintiff). Thus, though the products are undoubtedly similar, this factor deserves little weight when viewed in context.

### 3.      The Area and Manner of Use is Similar

To assess the concurrent use factor, courts examine whether "there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Id.* at 900. Additional considerations include "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Sorensen*, 792 F.3d at 730.

Here, both parties distribute their products nationally, including through their own websites and online retailers like Amazon and eBay. PSOF ¶¶ 11, 13, 14; [1-6]; [124-28]; [124-34]. The parties' Capsule cases can appear in the same online

shopping search results. *See* [1-6]; [124-9] at 8. The parties thus avail themselves of similar distribution means and channels of commerce.

Arguably the parties target somewhat different demographics. *Compare* [124-28] (Uncommon website featuring customized phone with photo of a mother and child) *with* [124-34] at 4–12 (Spigen website advertising cases as "Military Grade" with banner showing soldiers). But construed in the light most favorable to Plaintiff, the record fails to disprove that the parties target the same "general audience" of cell phone case consumers. *Sorensen*, 792 F.3d at 730.

On balance, the concurrent use factor favors Plaintiff, given the similar listings of the Capsule products on third-party web platforms and their concurrent national reach. But Plaintiff offers no evidence of similarities between the parties' promotional or marketing activities, which could be significant in determining whether the parties' products truly compete with one another. *See JL Audio*, 29 F. Supp. 2d at 891–92 (factors to determine whether products are truly in competition include whether they are sold in the same stores and sections of stores, or use the same "means of advertising"). Because "cell phone case consumers" describes much of the American public, the lack of evidence as to what part of that market the parties actually target leaves open the possibility that they pursue very different consumers. Thus, this minimal showing of "direct competition" between the parties' products reduces the weight of this factor. *See id.* (citing *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330 (7th Cir. 1993)).

### 4. Consumers Are Likely to Exercise Care

The degree of care factor assesses how sophisticated and discriminating the

relevant consumers are in purchasing the disputed products. *See Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997). When consumers are sophisticated—for example, if the relevant purchasers are primarily within a commercial industry—they exercise a high degree of care, minimizing the likelihood of confusion. *Id*. Where consumers might buy something quickly or impulsively—for example, because the product is inexpensive and replaceable— there is a greater likelihood of confusion. *See TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F. Supp. 543, 552 (N.D. Ill. 1995). Thus, the degree of care can relate to price point. *See Maxim's Ltd v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985). But purchases related to taste, artistic expression, or other subjective experiences are likely to be discriminating regardless of price. *See JL Audio*, 29 F. Supp. 2d at 892; *Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1356 (N.D. Ill. 1996).

Here, cell phone cases can be low-cost, but their prices vary widely. Defendant's cases commonly sell for $14.99, [149-19, 149-21], while Plaintiff's cases have sold for as much as $39.95, [124-24] at 2, with others listed at $24.95, [124-28] at 2. Widely varying prices—particularly of goods in a competitive market— indicate that consumers are likely to exercise a greater degree of care. *Knaack*, 955 F. Supp. at 1001 ("Because car covers at mass merchandisers are sold at different price points and in competition with competing covers, consumers can be expected to inspect the product information before purchasing."). Additionally, with the variety of phones and generations of phone on the market, consumers "must make certain that they are buying the right size" and type of case "to meet their needs"— another reason to exercise care. *Id*.

Plaintiff offers no evidence other than price to show that consumers buy cell phone cases impulsively. *See* [148] at 13. Plaintiff does point to Defendant's consumer survey as evidence that consumers use little care in selecting their cases because consumers often could not recall the brand name of their case. [158] at 28. The survey, however, shows that nearly half of respondents did know the brand of their case, and in any event, the respondents cited a number of factors that weighed more heavily in their purchasing decisions, including cost, level of protection, design, functionality, online reviews, and whether it fits their phone. [124-19] at 7, 8. Such considerations indicate that consumers take time to assess a variety of attributes of phone cases, including aspects like design and specific fit that courts have found indicate a higher degree of consumer care. *See JL Audio*, 29 F. Supp. 2d at 892; *Knaack*, 955 F. Supp. at 1001.

If anything, Plaintiff's own marketing materials and customization features show that cell phone cases can be a means of subjective self-expression, *see* [124-15], [124-14] at 7–15, which means that consumers are likely to be discriminating in such purchases regardless of price, *see Tsiolis*, 946 F. Supp. at 1356.

Plaintiff asserts that its failure to offer evidence of care leaves this factor "neutral," [158] at 28, but that is not the case. Although this Court construes inferences in Plaintiff's favor on Defendant's summary judgment motion, it is still Plaintiff's burden to establish the elements of its claims, *Celotex*, 477 U.S. at 322–23, which here requires demonstrating a likelihood of consumer confusion, *see S Indus.*, 12 F. Supp. 2d at 804. Thus, Plaintiff's failure to introduce evidence may be fatal to its claims. *See Packman*, 267 F.3d at 646. In any event, Plaintiff does not

create a genuine issue of material fact with respect to consumer care, and this factor weighs in favor of Defendant.

### 5. Plaintiff's Mark is Weak

For purposes of consumer confusion analysis, a mark's strength depends upon two elements: first, how inherently distinctive it is, based upon where the mark falls on the spectrum between generic and arbitrary, and second, whether the public considers the mark to indicate a "particular source," which may be the result of the mark's distinctiveness, "wide and intensive advertisement," or both. *See Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978).

This Court already found Plaintiff's mark so lacking in distinctiveness as to be void for descriptiveness. Use of a descriptive term in a mark may mean that "that feature of the mark" is "of less significance in designating a source of origin." *Henri's Food Prods.*, 717 F.2d at 356. Thus, Defendant's use of the mostly descriptive term "capsule" in its marks is not a strong indicator of their products' source, and is unlikely to cause consumer confusion. Additionally, the record shows that the term capsule is used by various makers of cell-phone cases, beyond the parties to this case. *See* [1-6]; [124-8]; [124-9] at 8, 11. Such wide use of similar terms by different companies further weakens the mark. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164–65 (9th Cir. 2009); *see also Packman*, 267 F.3d at 646 ("widely used descriptive phrase" indicated a weak mark); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986) (use of contested "location boxes" by many competitors indicated plaintiff's mark was weak).

Plaintiff offers no evidence directed to this factor, other than its earlier arguments that its mark is not descriptive, which this Court already discussed. Beyond that, Plaintiff argues without citation that its lengthy use of the mark and the "success of Plaintiff's business stemming from using the mark" prove the mark's strength. [158] at 27. Although Plaintiff provides certain sales records, *see e.g.*, [150-1], it offers no evidence linking the sales to the mark (rather than, for example, the customizable feature of the Capsule case), nor does Plaintiff offer any evidence that the mark has the kind of "fame" with consumers that supports an inference of strength, *see Telemed*, 588 F.2d at 219. Nor do the not-quite eight years of Plaintiff's use of the mark constitute "lengthy use." In *Telemed*, the Seventh Circuit found that the plaintiff's use of the mark for nine years failed to constitute a sufficient period for that consideration to affect the strength of the mark. *Id*.

Finally, Plaintiff points to Defendant's consumer survey (despite contending elsewhere that it is inadmissible). [158] at 27, [148] at 14. Plaintiff argues that because the survey shows its brand recognition equals Defendant's, its mark is strong. The survey, however, shows that no consumers were able to name either Plaintiff, Defendant, or "Capsule" as brands of cell phone cases when unaided, and only six percent were familiar with Capsule as a cell phone case brand when presented with it as a suggestion. [124-19] at 9, 10. Thus, Plaintiff's mark is weak.

### 6.    No Evidence of Actual Confusion

Although proof of actual confusion among consumers is not required to prove likelihood of confusion, "courts often view evidence of actual confusion as the best evidence of likelihood of confusion." *Union Carbide Corp. v. Ever-Ready Inc.*, 531

F.2d 366, 383 (7th Cir. 1976). The importance of this factor "is greater when the products involved are low value items because purchasers are unlikely to complain when dissatisfied, which would bring to light confusion." *Id.* Additionally, concurrent use of a disputed mark "without any instances of actual confusion weighs heavily against finding any likelihood of confusion." *S Indus.*, 12 F. Supp. at 818. In some cases, "lack of evidence of actual confusion" may be "conclusive" on the issue of consumer confusion. *Box Acquisitions*, 32 F. Supp. 3d at 939 (citing *Nike, Inc. v. Just Did It Enters.,* 6 F.3d 1225, 1231 (7th Cir.1993)).

Here, Plaintiff admits that it has no evidence of actual confusion between its Capsule cases and Defendant's, R. DSOF ¶ 52, which ought to end the matter. Despite this, Plaintiff asserts that Defendant has admitted the likelihood of consumer confusion, which it argues is dispositive of the entire confusion inquiry. [148] at 15. However, the paragraphs in Defendant's Answer that Plaintiff points to pertain to Count II of Defendant's counterclaim asserting prior use of the mark, [47] ¶¶ 38–40, which this Court dismissed, [62] at 15, and in any event contain no direct admission of confusion. Nor do Defendant's admissions elsewhere clearly admit consumer confusion. Instead, Defendant's responses to Plaintiff's requests for admission (RFAs) merely preserve its defense that Defendant is the senior user of the mark, [149-19] (RFA Nos. 55, 57), and in one instance argues—presumably in service of its since-abandoned counterclaim—that Plaintiff's mark is subject to cancellation because of Defendant's senior use of the mark, *id.* (RFA No. 64).

In no way do these responses resemble the circumstances of the cases cited by Plaintiff, which either do not support Plaintiff's position, are confined to specific

53

factual circumstances, are out-of-circuit opinions that fail to persuade this Court, or some combination of the above. *See, e.g.*, *Days Inns Worldwide, Inc. v. Lincoln Park Hotels, Inc.*, 500 F. Supp. 2d 770, 774–75 (N.D. Ill. 2007) (defendants admitted confusion at least in part because purpose of motion was to shift blame to another defendant and in any event dispositive issue was lack of evidence, not admissions); *Martahus*, 3 F. 3d at 419–20 (both parties agreed that there was a likelihood of confusion so the case did not present the issue).

Thus, Plaintiff fails to offer evidence of actual confusion. This factor necessarily favors Defendant, and provides added significance here because of the relative ease of replacing low-cost or mid-range cell phone cases. *See Box Acquisitions*, 32 F. Supp. 3d at 939. Moreover, this factor is one of the three given particular importance by the Seventh Circuit, *Packman*, 267 F.3d at 643, and thus, this Court gives it appropriate weight.

### 7. No Evidence of Intent to Palm Off

The final confusion factor is the third "particularly important" factor. *See Packman*, 267 F.3d at 643. The "intent to palm off" factor asks whether the alleged infringer is "trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *G. Heileman Brewing*, 873 F.2d at 1000. This constitutes "a type of fraud." *Liquid Controls*, 802 F.2d at 940. It cannot be proven by "the mere similarity of names" or even mere "copying," particularly where the copied term is descriptive. *Id.* It requires some evidence of the defendant's bad faith, which can be countered by evidence that the defendant intended "to promote itself as the

54

source" of the product. *Packman*, 267 F.3d at 644. Distinctive appearances and a "clearly stated designation of origin" weigh against finding an intent to palm off. *Door Sys., Inc. v. Overhead Door Sys., Inc.*, 905 F. Supp. 492, 496 (N.D. Ill. 1995).

Here, use of the mostly descriptive term "capsule" does not lend itself to finding bad faith on Defendant's part. Additionally, the distinctive appearance of Defendant's Capsule product packaging along with the constant application of Defendant's brand name (the "designation of origin") weigh against finding the intent to palm off. *See, e.g.*, [149-11]; *Overhead Door Sys.*, 905 F. Supp. at 496.

Plaintiff argues that Defendant's knowledge of its mark's existence shows bad faith, [148] at 17, but the Seventh Circuit has held that mere knowledge of a competitor or its mark does not show fraudulent intent, particularly where the phrase is widely used or the marks' appearances are distinct, *Packman*, 267 F.3d at 644–45 (citations omitted). Nor do Defendant's continued applications to the USPTO to register its Capsule family marks necessarily indicate bad faith, as Plaintiff suggests. [158] at 30. Rather, Defendant may have reasonably considered that Plaintiff's mark did not bar Defendant's use of the term "capsule," particularly once the USPTO approved Defendant's application for "Capsule Capella." *See Knaack*, 955 F. Supp. at 1004 (USPTO approval of allegedly similar mark may weigh against finding intent to palm off). Plaintiff's conclusory assertions to the contrary do not create a genuine issue of material fact. *Packman*, 267 F.3d at 645.

### 8. Summary

Thus, the three most important factors—"the similarity of the marks, the defendant's intent, and actual confusion"—all favor Defendant, as do the degree of

care and strength of the mark. *Packman*, 267 F.3d at 643. Overall, "there can be no doubt" that Defendant's use of "capsule" is unlikely to cause consumer confusion. *Door Sys.*, 83 F.3d at 171. Because this is a necessary element of all three of Plaintiff's claims, this Court grants Defendant's motion for summary judgment on those claims. *See Packman*, 267 F.3d 628 (affirming summary judgment where plaintiff failed to demonstrate likelihood of confusion).

## IV. Conclusion

For the reasons explained above, this Court grants in part and denies in part the parties' motions for summary judgment. [123, 147]. This Court grants Defendant summary judgment on all of Plaintiff's claims and on Defendant's counterclaim that Plaintiff's mark is merely descriptive without secondary meaning. This Court grants Plaintiff summary judgment on Defendant's counterclaim that Plaintiff's mark is generic. Because Plaintiff's mark is merely descriptive and lacks secondary meaning, this Court orders the USPTO to cancel U.S. Trademark Registration No. 4,338,254. 15 U.S.C. § 1119.

Because this Court does not award Plaintiff damages, Defendant's motion to strike Plaintiff's expert report on damages [107], is denied as moot.

This Court also denies Plaintiff's motion to strike Defendant's expert report [104], and Plaintiff's motion to strike Kirk Martensen's affidavit [177]. Defendant's motion to withdraw or amend certain requests for admission [180] is granted in part and denied in part, as discussed above.

Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's complaint for trademark infringement. [1]. Judgment is entered in favor of

Plaintiff and against Defendant on Count III of Defendant's counterclaim. [47].
Judgment is entered in favor of Defendant and against Plaintiff on Count IV of
Defendant's counterclaim. *Id.* Civil case terminated.

Dated: March 26, 2018

Entered:

John Robert Blakey
United States District Judge